FILED

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

**ABEBE GELLAW,**

*Plaintiff,*

*v.*

**GOOGLE LLC, XXVI HOLDINGS INC.,**

**YOUTUBE LLC, and ALPHABET INC.**

*Defendants.*

Civil Action No. 1:25cv 1602-
RDA-LRV

### COMPLAINT

**Antitrust, Fraud, Conversion, Abuse of Monopoly Power and Related Claims**

#### JURY TRIAL DEMANDED

---

### PRELIMINARY STATEMENT

1.    Plaintiff Abebe Gellaw believed YouTube's stated mission: "to give everyone a voice and show them the world." As a journalist and human rights advocate, he was convinced that YouTube was the right platform to report and document human rights violations, war crimes, ethnic cleansing, and abuse of power in Ethiopia and East Africa.

2.    This action challenges Google's abuse of its adjudicated monopoly power, including fraud, conversion, unjust enrichment, spoliation of evidence and data, AI-powered "forfeiture" of

1

earned revenue, manifesting widespread dispossession affecting millions. Google LLC's systematic abuse of its judicially-adjudicated monopoly power through what it calls "forfeiture" of Plaintiff's vested 55% share of revenue from advertising and subscription has no legal basis. As the Supreme Court established in *United States v. Bajakajian*, 524 U.S. 321, 331 (1998), forfeiture is "punishment imposed by the sovereign," not a power available to private corporations. Yet Google, doing business as YouTube without disclosing it is the actual contracting party, has systematically forfeited earnings from millions of creators, claiming "forfeiture" power it does not possess.

3.     EVN Media channel was launched in September 2023. In July 2025, Defendants terminated the channel—EVN Media with over 65,000 subscribers—through automated systems. Defendants seized earned advertising and subscription revenue declaring it "forfeited." Despite repeated requests, Defendants blocked migration of 320 irreplaceable videos documenting war crimes and gross human rights violations to competing platforms including Rumble. The termination's stated basis was not content policy violation but what Defendants call "circumvention"—guilt by association with another journalist whose channel had been previously terminated. Even if Google's allegations against the third party were true, Plaintiff never signed up for policing duty or offered to work as an unpaid compliance officer for a trillion-dollar corporation. ***Despite the arbitrary nature of Plaintiff's channel termination, he does not challenge Google's broad platform moderation power under 47 U.S. Code § 230 of the Communications and Decency Act.***

4.     Google manager Jon declared in an August 28, 2025, email: "After a final review of your associated AdSense account, we have determined that the pending earnings are ineligible for payout and have been forfeited." (Exhibit 1). He disclosed that this is "standard for all

channels terminated for violating the policies." Google's own transparency report reveals that it terminated 28.8 million channels in 2024. (Exhibit 2). Based on Google's own two-year data of appealed and reinstated videos (2023 and 2024) as an indicator of the margin of error, the average rate of error is estimated 12%. That means around 3.8 million channels could have been removed by automated errors without meaningful recourse. Evidence confirms the company has a policy of forfeiting vested revenue shares from terminated channels. If very conservatively and merely 10% of the total channels affected had an average $500 in forfeited earnings, the conversion translates into $1.44 billion in unjust enrichment only in 2024. This level of monopolistic misappropriation of private property under the guise of "forfeiture" calls for judicial scrutiny as it is neither legally justifiable nor morally defensible.

5.    This Honorable Court has already found Google's monopolistic conduct unlawful. In *United States v. Google LLC* (E.D. Va. Apr. 17, 2025), Judge Leonie Brinkema found Google illegally monopolized advertising technology markets through integration strategies that "substantially harmed Google's publishing customers, the competitive process, and, ultimately, consumers."

**JURISDICTION AND VENUE**

6.    This action arises under the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as well as supplemental state law claims. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1337(a) (commerce and antitrust), and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

7.     Personal jurisdiction and venue are proper under 15 U.S.C. § 22, which provides: "Any

suit, action, or proceeding under the antitrust laws against a corporation may be brought not

only in the judicial district whereof it is an inhabitant, but also in any district wherein it may

be found or transacts business." Defendants generate substantial advertising revenue from the

district residents establishing both general and specific personal jurisdiction under

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945). Although this Court has federal

question jurisdiction under 15 U.S.C. §§ 1-2, diversity jurisdiction also exists under 28

U.S.C. § 1332 as Plaintiff is a citizen of Virginia, while Defendants are citizens of Delaware

corporate entities. The amount in controversy exceeds $75,000 exclusive of interest and

costs.

8.     Google's forum selection clause, while denying access to Plaintiff's copy of contract and

leveraging unconscionable contracts of adhesion, capping liability at $500 and requiring

litigation only in Santa Clara County, CA, cannot override the Clayton Act's express venue

provisions. As the Supreme Court explained in *United States v. Scophony Corp.*, 333 U.S.

795, 807 (1948), Congress enacted § 12 of the Clayton Act specifically to remove venue

barriers that historically insulated monopolists from accountability, relieving injured persons

from the "often insuperable obstacle" of suing in distant districts.

## PARTIES

### A. PLAINTIFF

9.     Plaintiff is a resident of Spotsylvania County, Virginia, an investigative journalist, and

human rights advocate with a Master of Laws (LLM) from George Mason University's

Antonin Scalia Law School. A former J.S. Knight Journalism Fellow at Stanford, he received

Human Rights Watch's Hellman/Hammett Award (2011) and worked at Google as a senior linguist with a flagship AI project of its time, Google Translate. In 2012, a federal Ethiopian court sentenced him *in absentia* to 15 years imprisonment on politically motivated charges related to his journalism, persecution documented by international human rights groups including the Committee to Protect Journalists.

## B. DEFENDANTS

10.    ALPHABET INC. is a Delaware corporation with principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043, serving as parent holding company.

11.    GOOGLE LLC is a Delaware limited liability company with principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. It is wholly owned by XXVI Holdings Inc. and operates globally dominant products and services including Search, Chrome browser, Android OS, and the largest online advertising platforms.

12.    YOUTUBE LLC is a Delaware limited liability company with principal address at 901 Cherry Avenue, San Bruno, California 94066. Created on November 8, 2006, YouTube LLC exists as the "survivor" entity of the merger between YouTube Inc. and Google Inc (through Snowmass Holdings Inc.) closed on November 13, 2006. YouTube's own "Contact Us" page reveals another obscure corporate layer: "Google LLC, D/B/A YouTube, 901 Cherry Ave. San Bruno, CA 94066." (Exhibit 14).

13.    XXVI HOLDINGS INC. is a Delaware corporation formed September 1, 2017, as a holdings company with principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. While the company has no known contractual or operational

5

relationship with YouTube content creators, including Plaintiff, XXVI Holdings issues IRS

tax forms such as 1099 and 1042s as the "PAYER" of "royalties". According to a 2018 West

Virginia filing, the registered officers of XXVI Holdings are Google executives Anat

Ashkenazi (Google CFO), Thomas Hutchinson (VP of Tax), Kathryn Hall (VP, Legal and

Head of Corporate), and Kent Walker, Google's Chief Legal Officer. (Exhibit 15).

## FACTUAL ALLEGATIONS

### A. Google's Adjudicated Monopoly Power

14.    Four federal courts have found Google's monopoly conduct unlawful, providing *prima
       facie* evidence under 15 U.S.C. § 16(a). On April 17, 2025, Judge Leonie M. Brinkema found
       "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining
       monopoly power in the open-web display publisher ad server market and the open-web
       display ad exchange market, and has unlawfully tied its publisher ad server (DFP) and ad
       exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act."

15.    In *United States v. Google, LLC*, No. 20-cv-3010, 2024 WL 3647498 (D.D.C. Aug. 5,
       2024) Judge Amit Mehta found Google illegally monopolized search markets through
       exclusive dealing arrangements worth tens of billions annually. Judge Mehta wrote: "Google
       is a monopolist, and it has acted as one to maintain its monopoly," noting Google's 89.2%
       share of general search (95% on mobile) gave it power to exclude rivals and extract
       monopoly profits.

16.    On December 11, 2023, a Northern District of California jury in *Epic Games v. Google*,
       No. 3:20-cv-05671-JD (N.D. Cal. Dec. 11, 2023) found Google illegally monopolized
       Android app distribution and in-app billing markets, with Judge James Donato condemning

Google's evidence destruction as "a frontal assault on the fair administration of justice" and "the most serious and disturbing evidence I have ever seen in my decade on the bench." The Ninth Circuit affirmed the *Epic Games* verdict July 31, 2025, holding that Google's anticompetitive conduct would "continue to harm competition."

17.    These findings demonstrate Google's extensive, persistent, and strategic pattern of acquiring and maintaining monopoly power through anticompetitive means rather than competition on merits. Google's YouTube playbook mirrors these adjudicated violations: tying Google AdSense for monetization, preventing content migration to competitors, exploiting dominance through unlawful taking of creator revenues, and unilateral contract modifications under economic duress.

## B. The Relevant Market

18.    The relevant market is online video search, streaming, and advertising, where Google via YouTube holds monopoly power. YouTube, or Google doing business as (dba) YouTube except for the disclosure, is Google's video department. They are two sides of the same coin. YouTube is not merely a social media platform but the world's second-largest search engine after Google. It has 2.7 billion monthly active users and is the second-most-visited website in the world.[1] YouTube is also integrated with Google's infrastructure. Unlike TikTok or Instagram, YouTube functions as a search engine where users actively query for specific content. This search functionality, combined with Google's advertising monopoly through

---

[1] See YouTube: The World's Second Largest Search Engine,
https://odp.library.tamu.edu/mediacommunication2e/chapter/youtube-the-worlds-second-largest-search-engine/

mandatory Google AdSense integration, creates a unique market position that no competitor can rival. As Voltaire is credited ~~to say~~ *as saying*: "With great power comes great responsibility."

19.    YouTube's market power exists but for Google's monopoly power in search and advertising. The absence of reasonable substitutes results from Google's deliberate foreclosure. By preventing creators from migrating non-violating content to platforms like Rumble, Google must realize that these platforms could be competitors for content supply. According to YouTube's own April 2025 revelations, there are 20 billion videos on the platform with 500 hours of video uploaded every minute—a scale that dwarfs any market competitor.[2]

### C. Illusory Partnership

20.    On September 4, 2023, Plaintiff received an email that offered a legitimate business opportunity after passing the threshold, 4,000 hours of views and one thousand subscribers. "Welcome to the YouTube Partner Program....You did it, EVN for Ethiopia! You've been accepted into the YouTube Partner Program, which means you can now earn money from your content and take advantage of additional benefits like expanded copyright protection tools and access to our Creator Support team." (Exhibit 3).

21.    The YouTube Partner Program (YPP) Terms use variations of "partner" throughout 38 times, explicitly defining partnership through revenue shares: "YouTube will pay you 55% of Net Revenues from ads displayed or streamed by YouTube or an authorized third party: (a) on your Content Watch Pages; or (b) in conjunction with the playback of your Content within

---

[2] See 20 ways we're celebrating two decades of YouTube, https://blog.youtube/news-and-events/happy-birthday-youtube-20/

the YouTube Video Player. YouTube will pay you 55% of the Net Revenues from subscription fees that are attributed to the monthly views or watchtime of your Content." (Exhibit 16).

22. Yet buried in separate terms on an entirely different website, Google.com, the mandatory Google AdSense Terms categorically negate this partnership: "This Agreement does not create any partnership, joint venture, or agency relationship between you and Google." The AdSense Terms further declare: "The AdSense Terms are our entire agreement relating to your use of the Services and supersede any prior or contemporaneous agreements on that subject." (Exhibit 17). This means every representation of "partnership" in the YouTube Partner Program is nullified by the mandatory terms of Google AdSense tied to the service.

23. These inherently contradictory contracts of adhesion cannot be reconciled. The YPP terms state: "Where there is any conflict between these Base Terms and: (i) a Module, the Module will apply; and (ii) the AdSense terms, these Base Terms will apply." Both claim supremacy, allowing Google to invoke whichever benefits it most in any situation—the hallmark of an illusory contract. (Exhibit 16)

24. Google executives knowingly perpetuate this fraudulent misrepresentation publicly. On October 10, 2024, Thomas Kim, Director of Creator Monetization at YouTube, appeared on YouTube's Creator Insider channel (778,000 subscribers) declaring: "This word 'partner' gets thrown out a lot, but I think for us 'partner' really is at the heart of the YouTube Partner Program. Because what it really means is: we succeed when you succeed. It's this mutual contractual commitment that we have to each other." (Exhibit 18).

9

25.    YouTube CEO Neal Mohan told Emily Chang of Bloomberg in a May 24, 2024, video interview: "Our business is successful when our creators' business is successful," explicitly describing mutual dependency characteristic of true partnership. He told Bloomberg: "We have 3 million creators in our YPP program. So, that is lots of millions of creators literally earning a living on our platform. Most of that is generated through advertising. Advertising is our primary business. But, increasingly, our SVOD [Subscription Video on Demand] business, our subscriptions business, of which there are two flavors—has grown to be a very meaningful part of our business as well." (Exhibit 19).

26.    In a September 2025 interview with Stratechery, YouTube CEO Neal Mohan stated: "The nice thing about the YouTube business model is that it ensures almost complete alignment with the creators that are on our platform. We have the YouTube Partner Program, millions of creators are in it, and it's a rev share model, so the more revenue we generate through ads, the more our creators generate."[3]

27.    Mr. Mohan and Mr. Kim made these misrepresentations knowing: (a) Google AdSense Terms void any partnership; (b) YouTube LLC has no independent operational existence; (c) creators have zero say, profit participation, property rights, or protection from unilateral termination; (d) Google modifies terms at will at any time; (e) XXVI Holdings claims to be the payer of "royalties" in tax forms completely rewriting the terms. Every interaction with "YouTube" support came from yt-partner-support@google.com, and termination notices contain footnotes: "© 2025 Google LLC d/b/a YouTube." (Exhibit 14)

---

[3] See *An Interview with YouTube CEO Neal Mohan*, https://stratechery.com/2025/an-interview-with-youtube-ceo-neal-mohan-about-building-a-stage-for-creators/

**D. The Corporate Structure**

28.    Delaware corporate records indicate YouTube LLC , which pays $300 annual tax
assessment. (Exhibit 4) However, YouTube does not operate its business independently as
Google runs the show doing business as YouTube. Alphabet's 2024 Form 10-K reports:
"YouTube advertising revenues reached $36.1 billion in 2024, an increase of $4.6 billion
from 2023." (Exhibit 5).

29.    Just five days before the November 13, 2006 closing of YouTube's acquisition, ~~created~~
YouTube was registered as an LLC in Delaware on November 8, 2006, replacing YouTube
Inc. as the "surviving" entity upon merger. (Exhibit 20). This substitution created YouTube
LLC presented to millions as their contracting "partner" while retained all operational
control, revenue, and the YPP.

**E. Royalties Without Licensing Agreement**

30.    While the YouTube Partner Program promises "YouTube will pay you," all payments
originate from Google AdSense. Tax forms are issued by XXVI Holdings Inc., an entity with
no contractual relationship with creators, identifying itself as "PAYER" on Form 1099-MISC
and classifying payments as "royalties." (Exhibit 13). YPP and GOOGLE'S Royalty
Problems. In the last few years, tax avoidance accusations against Google have resulted in
settlements across multiple jurisdictions including Italy ($340 million)[4], France ($1 billion)[5],

---

[4] See "Google agrees to pay Italy $340 million to settle a tax evasion investigation," https://apnews.com/article/italy-tax-evasion-investigation-google-earnings-advertising-3b4cd3e1f338ba0d5a3067f5919383b3

[5] See "Google pays France over $1 billion to settle tax case," https://www.nbcnews.com/tech/tech-news/google-pays-france-over-1-billion-settle-tax-case-n1053106

Australia ($481.5 million)[6], and Ireland ($387 million)[7]. Professors Bret N. Bogenschneider and Ruth Heilmeier, in their article "Google's Alphabet Soup in Delaware" published in the Houston Business and Tax Law Journal, detail how Google affiliates deduct royalty payments as business expenses in other states while Alphabet receives those royalties in Delaware, where they're exempt from state tax under Del. Code tit. 30, § 1902(b)(8).[8] This strategy may explain why Google, via XXVI Holdings, unilaterally recharacterizes YouTube Partner Program revenue shares, explicitly defined as advertising and subscription revenue splits in YPP terms—as 'royalties' on IRS Form 1099 and 1042 forms, despite creators granting YouTube "royalty-free" licenses, under YouTube's public-facing ToS, and having no licensing agreement with Google, YouTube or XXVI Holdings Inc. (Exhibit 20)

31.    Neither Plaintiff nor other YPP content creators have known contractual relationships with XXVI Holdings. The revenue share versus royalty distinction has major tax implications on YPP participants including Plaintiff. Additionally, willful attempt to evade tax through false classifications is a violation under 26 U.S.C. § 7201, which is an issue beyond this complaint. This is unconscionable and fraudulent conduct that makes a mockery of the fundamental principles of contract law. In *United States v. Pomponio* 429 U.S. 10 (1976), the Supreme Court held that for the tax offense of willfully filing false tax returns under 26 U.S.C. § 7206(1), "willfulness" simply means the "voluntary, intentional violation of a known legal

---

[6] See "Google coughs up $481.5M in Australian tax dispute settlement", https://www.arnnet.com.au/article/1256767/google-coughs-up-481-5m-in-australian-tax-dispute-settlement.html
[7] See "Google settles tax payment in Ireland", https://www.itpro.com/business/361667/google-settles-tax-payment-in-ireland
[8] Bret N. Bogenschneider & Ruth Heilmeier, "Google's 'Alphabet Soup' in Delaware," 16 Hous. Bus. & Tax L.J. 1, 13–15 (2016) (discussing combined reporting states and exclusion of foreign royalties); id. at 31

duty. Willful filing of false tax documents constitutes tax law violations, and misclassifying income types knowingly affects tax obligations.

32.    YouTube's own Terms expose this recharacterization: "You grant to YouTube the right to monetize your Content on the Service (and such monetization may include displaying ads on or within Content or charging users a fee for access). This Agreement does not entitle you to any payments." Yet the same document declares: "Starting November 18, 2020, any payments you may be entitled to receive from YouTube under any other agreement between you and YouTube (including for example payments under the YouTube Partner Program) will be treated as royalties." (Exhibit 21). This unilateral conversion of revenue share into "royalties" allows Google to claim creator payments as deductible content acquisition costs, while the payments are actually pass-through shares of net revenue. This scheme entirely rewrites the YPP terms, transforming partnership revenue sharing into licensing payments which is illusory given the royalty-free grant.

33.    The payment structure also contains a fundamental contradictions that renders the whole agreement illusory. The YPP Terms state that "YouTube will pay you" a share of "Net Revenues" defined as revenues recognized by YouTube under U.S. GAAP [Generally Accepted Accounting Principles]. While this sounds real, the reality is contrary to this explicit promise. The mandatory Google AdSense Terms control the accounting as well as payout: "Payments will be calculated solely based on Google's accounting. You acknowledge and agree that you are only entitled to payment for your use of the Services for which Google has been paid; if, for any reason, Google does not receive payment from an advertiser or credits such payment back to an advertiser, you are not entitled to be paid for any associated use of the Services." However, the GAAP core principles include consistency, sincerity, good

13

faith and materiality. The principle of materiality requires transparent financial reporting and disclosures. The YPP financial aspects, including unlawful taking, failure to provide evidence and basic accounting, which are manifestations of systemic lack of transparency, are based on bad faith dealings. [9] They are neither consistent, transparent, nor sincere.

34.   The fraudulent misrepresentation is evident because: (1) Google knowingly mischaracterizes the economic substance of the transaction to multiple parties—telling creators they're "partners" receiving net revenue share while potentially saving billions through deductions as royalty payments or content acquisition costs; (2) the misrepresentation is material, affecting billions in tax liabilities and creator rights; (3) YPP creates "partnership" and "good faith", Google voids it through contradictory terms and practice; (4) creators, including Plaintiff, reasonably rely on the partnership representations when investing years building channels; (5) Google benefits from both sides of the transaction—attracting creators with partnership promises while significantly reducing its tax liabilities; and (6) XXVI Holdings, having no contractual privity with creators, cannot legally pay 'royalties' for content it never licensed, exposing the entire structure as a sham transaction designed to maximize tax benefits for Google while minimizing creator rights and voiding the entire YPP agreement.

**F. The Ultimatum: Monopolistic Economic Coercion**

35.   In 2023, YouTube executed a coercive campaign affecting millions globally. Through its YouTube Creators channel (9.4 million subscribers) and simultaneous website postings, Google issued this ultimatum: "If you don't accept at least the Base Terms by July 10, 2023,

---

[9] See the 10 core principles of *Generally Accepted Accounting Principles* (GAAP), https://financial-cents.com/practice-mgt-terms/generally-accepted-accounting-principles/

your channel will be removed from the YouTube Partner Program, and you'll need to requalify and reapply to join again." (Exhibit 21)

36.    This threat exemplifies economic duress as defined in *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124 (1971). Every element satisfied: (1) wrongful threat—accept new terms or lose established business; (2) fear of financial hardship—immediate termination of all revenue streams; (3) no reasonable alternative—Google's monopoly eliminates comparable platforms; (4) involuntary acceptance—submission under threat is not consent.

37.    The coercion was particularly egregious because it applied retroactively. Creators who produced content under earlier agreements were told they would lose earnings from videos already created if they didn't accept new terms. The conduct violates the fundamental principle from *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902), that contract modifications require new consideration. Google offered nothing new, only threats of destruction.

## G. The Termination: Retaliation Through Automation

38.    On July 21, 2025, Plaintiff's EVN Media channel was terminated at precisely 10:17 AM. The termination notice provided no specific violations, no examples of problematic content, no opportunity for meaningful appeal. (Exhibit 6). The appeal was denied with automated reasoning, revealing no human review occurred. (Exhibit 7).

39.    The termination's basis was not content policy violation but "circumvention"—an obscure policy punishing association with other terminated creators regardless of content compliance. This constitutes tortious interference with business relations and violates fundamental First Amendment rights of freedom of association. Google is moderating relationships, not just

15

content. Google support agent ED and Manager Victoria (Case ID 4-7788000039438) could only provide boilerplate language about "circumvention" that contradicted her own statements. Victoria claimed Plaintiff was terminated for "channels you owned or managed," but when Plaintiff clarified he merely worked with another journalist whose channel might be terminated previously, and "hasn't signed up for policing duty," Victoria had no substantive response except saying, "I'm really sorry." She confirmed Google would seize all pending earnings, claiming without evidence they would be "refunded to our advertisers" for advertisements already served. (Exhibit 9)

40.    Google's 2024 transparency report reveals 28.8 million channels terminated: Q4: 4,822,176 channels; Q3: 4,874,056 channels; Q2: 3,260,974 channels; Q1: 15,799,880 channels. According to the report, over 99% were flagged by automated systems. Meaningful human review of even one hour per channel would require 13,798 full-time employees working 40 hours weekly. (Exhibit 2)

41.    Manager Aaliyah's August 25, 2025, email provided a rare admission: "I wish there was more I could do to help you regain access to your content. However, once a channel has been terminated, the associated data and videos may no longer be available for export through Google Takeout. This is an automated process that our team is unable to override." (Exhibit 8a). She acknowledged: "I understand that this situation is incredibly frustrating and distressing, especially when your livelihood and community are tied to your channel." When Plaintiff stated he was aware that the mass terminations by AI are irreversible, Google Manager Victoria (Case ID 4-7788000039438) reflected a similar sentiment: "Echoing back the same with you might not be something you'd be happy to hear." (Exhibit 8). This constitutes admission by Google's management that: (1) the AI systems make irreversible

termination decisions; (2) human managers lack authority to override these decisions; and (3) Google knowingly operates a system where erroneous decisions cannot be reversed by managers and support teams.

**H. Systematic Discrimination Against US Citizens**

42.    Google's discrimination against US creators compared to European creators is enforced policy. On August 18, 2025, Representative Steve (Case ID: 0-5042000039769) initially claimed: "As per checking here, in order to get your YouTube Partner Program agreement, you must first resolve your channel termination." Manger Sands ended the "support" chat when Plaintiff clarified that he needed his contract as he was seeking legal representation saying she was referring the matter to Google's legal department, which never bothered to contact Plaintiff to date. (Exhibit 11b)

43.    The next day, Google support agent Shane (Case ID: 8-6515000040078) revealed deeper discrimination: "Here is a recap of the resolution provided earlier: since we have a limited scope to a specific regulatory requirement, we're unable to provide a contract copy as we can only respond to content owners whose sign-up location is within the UK and EEA only. I understand your point, but please know that we have thoroughly investigated your request and there is nothing more I can add." (Exhibit 10). Google's documented policy of categorically denying U.S. creators access to their YouTube Partner Program contracts, as evidenced by their August 28, 2025 written statement that "Access to YPP Agreement... is a privilege for creators in good standing" constitutes an unfair and unconscionable business practice that serves no legitimate business objective. While Google provides contract copies to UK/EEA creators due to consumer and data protection requirements in those jurisdictions, its refusal to extend the same basic right to U.S. creators creates severe procedural

17

unconscionability by denying them access to fundamental contract documentation needed to understand their rights, obligations, and potential remedies, particularly when facing legal disputes or seeking legal representation. This selective denial of contract access violates the Virginia Consumer Protection Act's prohibition on unfair trade practices, as it causes substantial injury that cannot be avoided and is not outweighed by any legitimate business benefit.

44.    Manager Aaliyah confirmed in an August 21, 2025 email: "Upon checking, I can see that my colleague has provided you with the correct information as you can only access the agreements you have signed if you are still part of our YouTube Partner Program." This means European creators obtain contracts for review, legal representation, or litigation, while American creators are categorically denied the same transparency from an American company.

## I. Blocking Competition: Restraint of Trade

45.    When Plaintiff requested to download his 320 videos to migrate to Rumble.com, Manager Jon's response revealed an anticompetitive purpose. On August 28, 2025, he wrote: "Regarding your request to download your videos for migration to another platform, I must inform you that we're unable to facilitate this request. The policies and decisions related to terminated channels are applied consistently across all cases." He then closed the case with finality: "This email constitutes our final communication on this matter." (Exhibit 1). Another Google manager named Sands emailed separately on August 4, 2025, that there is nothing more her team can do and will no longer respond to Plaintiff's request to, at least, have access to his contracts. "Beyond this, there's nothing more we can add. Going forward, please note that our team will no longer be able to respond to any further support tickets regarding this

specific issue," she wrote. (Exhibit 11) Even the government, with its sovereign powers, cannot arbitrarily seize wages without due process. In *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 342 (1969), the Supreme Court recognized wages as a 'specialized type of property' requiring heightened protection from arbitrary deprivation. If constitutional principles prohibit the government from seizing earned wages without proper procedures, it follows a fortiori that private companies should not be permitted to accomplish the same result through adhesive contracts of unconscionable terms. Google's Terms of Service provisions allowing complete forfeiture of earned creator revenues fail under Virginia law, which voids contract provisions that are procedurally and substantively unconscionable. "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract". Restatement (Second) of Contracts § 208. The unconscionability doctrine applies with particular force where terms are so harsh and oppressive that they permit what even government actors cannot do, arbitrary seizure of earned compensation without meaningful review or recourse. As Judge Cardozo cautioned in *Meinhard v. Salmon, 249 N.Y.* 458, 464 (1928), those in positions of control owe "the punctilio of an honor the most sensitive" when handling the property of others is a principle that surely prohibits achieving through private contract what constitutional law forbids the government from doing directly.

46.   The videos didn't violate content policies; termination was for alleged "circumvention" based on association. Google gains nothing from preventing download of non-violating content except for foreclosing competition. By holding content hostage, Google prevents creators from building audiences across platforms, blocks competitors like Rumble from building content libraries, and maintains monopoly through prevention rather than competitive merit.

47.    The scale makes this restraint devastating to competition. With 28.8 million channels terminated in 2024 alone, even if only 10% sought to migrate content, that's 2.88 million potential content suppliers blocked from reaching competing platforms, foreclosing billions of videos from potential competitors.

## J. Industrial-Scale Automated Seizures

48. During an August 1, 2025 support chat, Representative Neesa (Case ID: 8-3084000039587) made damaging admissions. When Plaintiff stated "We had over $1200 in the account. Now the data is deleted, and we have not been paid," Neesa did not dispute the amount or seizure. She admitted: "If your channel is terminated, or suspended from the YouTube Partner Program, you are then no longer entitled to earn any revenue under YouTube's channel monetization policies." She claimed Google withholds "earnings and, when appropriate and possible, use them to refund advertisers or viewers for purchases." When Plaintiff called this "free money for YouTube" and "a scam," Neesa offered no denial—constituting adoptive admission under Federal Rules of Evidence 801(d)(2)(B).

49.    Neesa's "advertiser refund" claim without any transparency and accounting was echoed by her line manager Jude. He said: "Now, regarding your payments, I'm afraid to say that if your channel is terminated or suspended from the YouTube Partner Program, you are no longer entitled to earn any revenue. YouTube may also withhold earnings and refund advertisers or viewers for purchases where appropriate and possible." (Exhibit 12) But none of the managers and agents were willing to provide evidence or identify which advertisers were refunded for adverts already served. Plaintiff wondered how a 3-trillion dollars corporate giant needs the little money desperately and quipped: "It is like the elephant who stole the ant's lunch." Jude could only offer an apology. "I'm sorry that you feel that way, but I'm

20

afraid we can really only enforce the terms and policies we have in place." (Exhibit 12)
Google's conduct of dispossessing hardworking small creators, for reasons other than content
violations, who labor, sweat, and bleed to produce content, serves no legitimate business
purpose but the advancement of unjust enrichment.

50.     Google Manager Jon declared in his in an August 28, 2025 email: "After a final review of
your associated AdSense account, we have determined that the pending earnings are
ineligible for payout and have been forfeited." (Exhibit 1) The earnings Jon referred to are
not contingent payments but vested property. It is the Plaintiff's 55% share of advertising
revenue and subscription revenue from completed transactions where Google has already
retained its 45% commission. These funds belong to creators as a matter of property law.
Google's characterization of keeping creators' vested earnings as 'forfeiture' admits to
exercising dominion over property it has no right to retain. As established in conversion law,
once a party takes possession of another's property and refuses to return it, they commit
conversion. See Restatement (Second) of Torts § 223. Google cannot transform theft into
lawful conduct by inserting the word 'forfeiture' in its unilateral policies it modifies at will on
Google.com. This would be equivalent to a bank declaring it 'forfeits' customer deposits or a
payment processor keeping merchant funds—both of which constitute conversion regardless
of any contract language. "Conversion is the wrongful assumption or exercise of the right of
ownership over goods or chattels belonging to another in denial of or inconsistent with the
owner's rights." *Economopoulos v. Kolaitis,* 259 Va. 806, 814 (2000)."An action for
conversion can be maintained only by the person having a property interest in and entitled to
the immediate possession of the item alleged to have been wrongfully converted."  Id.

21

51.    On September 20, 2025, a Google support agent named Ed and manager Victoria confirmed the forfeiture. ED claimed: "When channels are terminated, earnings are refunded to the Advertisers where those earnings are from." When he was asked to provide receipts and accounting, he replied: "Sorry but I do not have access to that information. And technically those earnings are not yours since your channel was terminated due to violation of our policy and it should be refunded to advertisers who paid for it." Victoria echoed the same: "Any earnings already added to your AdSense account will not be forfeited. However, all estimated earnings that have not yet been transferred to your AdSense account will be refunded to our advertisers." (Exhibit 9). However, this is just fraudulent misrepresentation as Google has repeatedly tried to evade the production of receipts and documentation.

52.    Private entities possess no legal authority to "forfeit" earned income. Forfeiture is governmental power subject to due process requirements under the Fourth and Fourteenth Amendments. Google's use of this term reveals knowledge they are taking property without right. With 28.8 million channels terminated in 2024, even assuming conservatively that only 10% had average pending earnings of $500, that means Google seized approximately $1.44 billion through automated "forfeitures"—approximately $4 million daily free money.

53.    Even the federal government must comply with the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 18 U.S.C. § 983, which mandates notice, hearing rights, burden of proof standards, and judicial oversight before forfeiting property. Yet Google, a private corporation with zero forfeiture authority, seizes creator earnings through automated systems without any notice, hearing, evidence, or judicial process knowing the bad faith inherent in calling private theft forfeiture.

**COUNTS**

22

**COUNT 1: Abuse of Monopoly Power**

**In Violation of Sherman Act § 2, 15 U.S.C. § 2**

54.    Plaintiff incorporates all preceding paragraphs. Defendants possess and maintain
monopoly power in the relevant markets of online video distribution, video monetization, and
creator economy platforms. YouTube dominates with no competitor approaching its 2.5
billion monthly users and 500 hours of video uploaded every minute.

55.    Google used its market power to force YPP participants to accept tying arrangements.
Monetization requires Google AdSense acceptance, whose terms declare supremacy over all
other agreements. This isn't merely technological tying but contractual coercion. See
*Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984) and *Northern Pacific
Railway v. United States*, 356 U.S. 1 (1958).

56.    Defendants willfully maintained and exploited monopoly through: (a) refusing to allow
Plaintiff and millions of creators to migrate content to competing platforms like Rumble,
foreclosing competition; (b) tying YouTube monetization to mandatory Google AdSense
acceptance; (c) imposing unilateral contract modifications through economic duress,
exploiting creators' lack of alternatives; (d) operating automated termination systems that
Google managers cannot override, eliminating due process protections that would exist in
competitive markets; (e) discriminating between US and foreign creators in contract access,
leveraging monopoly power to impose disparate treatment; (f) seizing creator earnings
through private "forfeiture" without legal authority.

57.    Plaintiff suffered antitrust injury directly flowing from Defendants' anticompetitive
conduct. His channel was destroyed, earnings seized, videos confiscated with no right to

download and migrate them to a competing platform specifically because Google's monopoly power eliminated alternatives. All this is possible but for Google's monopoly power.

## COUNT 2: Restraint of Trade

*In violation of 15 U.S. Code § 1*

58.    Plaintiff incorporates all preceding paragraphs. Defendants' refusal to allow content migration constitutes a contract, combination, or conspiracy in restraint of trade. By systematically preventing creators from downloading their own content to move to competing platforms, Defendants foreclose competition in video distribution markets.

59.    Manager Jon's "final" refusal to allow Plaintiff to download 320 non-violating videos for migration to Rumble reveals anticompetitive purpose. No legitimate business justification exists for preventing creators from accessing their own content that doesn't violate policies. The sole purpose is preventing competition.

60.    The restraint is unreasonable *per se* as market division preventing content creators from serving multiple platforms. Alternatively, under rule of reason analysis, the anticompetitive effects, foreclosing content supply to competitors, maintaining monopoly power through exclusion, preventing multi-homing by creators—vastly outweigh any conceivable procompetitive justification.

## COUNT 3: Fraudulent Scheme
## Fraud and Misrepresentation

61.    Plaintiff incorporates all preceding paragraphs. Defendants orchestrated a multifaceted fraudulent scheme to induce creators' reliance and investment while maintaining complete unilateral control over their relationship with millions of YPP participants.

62.    The fraud operates through three interlocking deceptions: First, presenting YouTube LLC as independent "partner" capable of contractual relationships when it is a shell company while Google does business as YouTube without clear and conspicuous disclosure. Second, repeatedly promising "partnership" and "mutual commitment" while mandatory AdSense Terms explicitly state "This Agreement does not create any partnership." Third, XXVI Holdings characterizes the YPP revenue shares as "royalties" on tax forms despite YouTube Terms requiring "royalty-free" licenses. It is legally impossible to owe royalties for royalty-free rights.

63.    The fraud elements are clearly established: (a) false representation—presenting YouTube as independent partner; (b) knowledge of falsity—executives know YouTube LLC is an empty shell; (c) intent to deceive—elaborate corporate structure shows deliberate design; (d) justifiable reliance—Plaintiff reasonably believed partnership representations; (e) damages—destroyed business, seized earnings, lost content, data and critical business records.

64.    IRS Publication 525 and Treasury Regulation § 1.6041-1 specify payments for services should be reported on Form 1099-NEC, as nonemployment compensation, not as royalties on Form 1099-MISC. There is no licensing agreement between Google and Plaintiff, or any YPP content creator. By mischaracterizing the 55% revenue share as "royalties," while YPP terms explicitly recognize the payments as revenue share in the conduct of active business relationships, not "royalty" pension, Defendants engages in fraudulent conduct to benefit themselves. Google shifts tax burdens to creators while potentially claiming improper deductions of payments as licensing and acquisition costs. This systematic misclassification affecting billions in payments may violate, among other legal violations, 26 U.S.C. § 7201. This elaborate scheme is possible but for Google's monopoly power.

25

**COUNT 4: Unconscionable Contract and Discriminatory Business Practices**

65.    Plaintiff incorporates all preceding paragraphs. The YouTube Partner Program agreement is both procedurally and substantively unconscionable, rendering it unenforceable under District of Columbia law.

66.    Procedural unconscionability is established through: (a) Adhesion—presented on take-it-or-leave basis with no negotiation possible; (b) Concealment—Google refused to provide copies to US citizens while granting access to Europeans. Moreover, Google has also actively concealed material fact from YouTube "partners", including Plaintiff, that YouTube is actually Google doing business as YouTube using the brand as a fictitious name while at the same time maintaining a Delaware shell with no evidence of conducting meaningful business other than being used as liability shield; (c) Bait and switch—Google baits YPP participants with an appealing deal for collaborative partnership and a specific 55/44 revenue share based on objective GAAP accounting principles. But it immediately switches the contract with the mandatory Google AdSense which declares no partnership and payment to be discretionary and based on "solely" on Google accounting;  (d) Economic duress—July 10, 2023 ultimatum forced acceptance under threat of destruction; (e) Surprise—terms hidden across multiple websites with contradictory provisions. This is possible but for Google's court-adjudicated monopoly which eliminated meaningful choice;

67.    The denial of contract access represents ultimate procedural unconscionability. A party cannot be bound by terms it is forbidden from reviewing by the controlling party. Google's admission it provides contracts to European creators, as a matter of regulatory obligation, while denying them to Americans creates an absurd paradox. Google seeks to enforce in American courts a contract it refuses to provide American citizens. Under *Williams v. Walker-*

26

*Thomas Furniture*, 350 F.2d 445 (D.C. Cir. 1965), unconscionable terms are unenforceable. A term allowing arbitrary seizure of earned funds by a monopolist could be substantively unconscionable, especially when Plaintiff repeatedly requested to be provided with access to a copy of his own contract only to be refused in writing multiple times.

68.    This discrimination violates the implied covenant of good faith and fair dealing inherent in all contracts under Virginia law. When a contract grants one party discretionary authority, that discretion is subject to the implied duty of good faith and fair dealing. See *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460 (E.D. Va. 2013). By granting foreign creators transparency and access to their data while denying it to Americans, Google acts in bad faith to deprive US creators of contractual benefits and their data to shield its monopolistic unlawful conduct from scrutiny.

69.    Substantive unconscionability appears in shocking terms no reasonable party would accept: (a) $500 liability cap for $3 trillion company—less than 0.000000015% of Alphabet's market value; (b) permanent denial of contract and data access upon termination; (c) automated decisions managers cannot override affecting livelihoods; (d) private "forfeiture" of earned funds without due process; (e) blocking content migration to competitors; (f) unilateral modification rights with no reciprocal obligations to advance Google's monopoly power.

70.    Manager Aaliyah's admission that termination is "an automated process that our team is unable to override" epitomizes unconscionability. Creators face unreviewable machine decisions destroying years of work while Google disclaims human accountability. No reasonable person with actual choice would accept these terms but for the lack of choice as Google exerts its monopoly power and foreclosure of market competition.(Exhibit 8b)

**COUNT 5: Conversion**

71.   Plaintiff incorporates all preceding paragraphs. Defendants converted Plaintiff's property without legal authority or justification. Plaintiff held vested property interests in: (a) over $1,000 in earned advertising revenue; (b) 320 videos documenting human rights abuses valued conservatively at $5,000 based on production costs and irreplaceable nature; (c) analytics data essential for financial records and business operations; (d) the YouTube channel itself as business asset with 65,000 subscribers have been "forfeited"—just to borrow Google's monopolistic and unlawful seizures.

72.   Manager Jon's August 28, 2025, declaration that "pending earnings are ineligible for payout and have been forfeited" confirms intentional conversion. Private entities have no legal authority to "forfeit" earned income. Forfeiture is governmental power subject to due process requirements. Using this term reveals Defendants know they are taking property without right. In a support chat on September 20, 2025, Google representative Ed echoed Jon's message and insisted that the forfeited earnings were refunded to advertisers. Then Plaintiff asked if Google steals from its partners. Ed replied: "[It] should not be earned in the first place that is why it is "forfeited" but in reality, it is refunded." Plaintiff wondered how Google can refund ads already served. Ed replied: "Yes, even if they are already served." (Exhibit 9)

73.   The seized videos represent irreplaceable documentation of war crimes, ethnic cleansing, and human rights violations in Ethiopia. These videos, created at substantial cost over two years documenting events and testimonies now lost, cannot be recreated. Each video, as intellectual property, required research, filming, editing, and upload, not to mention its

documentary value, conservative valuation based on industry standards and production time exceeds $4,000.

74. The systematic nature transforms individual conversion into unlawful profiteering scheme. With 28.8 million channels terminated in 2024 and conservative estimates of seized funds in billions, Defendants have potentially industrialized conversion through automation their own managers cannot monitor or reverse.

**COUNT 6: Spoliation of Evidence**

75. Plaintiff incorporates all preceding paragraphs. Defendants had a duty to preserve Plaintiff's contract, data, videos, and associated business records, knowing termination was likely to lead to legal dispute. Plaintiff explicitly notified Defendants of intention to take legal action. Instead of preserving evidence, Defendants destroyed it through automated process while simultaneously denying Plaintiff access to the contract he allegedly violated.

76. Manager Aaliyah admitted August 25, 2025: "Once a channel has been terminated, the associated data and videos may no longer be available for export through Google Takeout. This is an automated process that our team is unable to override." This destruction occurs despite Plaintiff's explicit requests for his data and notice of legal action. (Exhibit 8b)

77. This destruction fits Google's documented pattern condemned by multiple federal courts. Judge Donato called Google's evidence destruction "a frontal assault on the fair administration of justice" and "the most serious and disturbing evidence I have ever seen in my decade on the bench." Judge Mehta was "taken aback by the lengths to which Google goes to avoid creating a paper trail for regulators and litigants." Judge Leonie Brinkema of this Honorable Court also noted in her ruling that Google engaged in "systemic disregard of

the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client

privilege." The destruction severely prejudices Plaintiff's ability to prove damages, seek legal

representation, and contest the unlawful conduct.

## COUNT 7: Unjust Enrichment

78.    Plaintiff incorporates all preceding paragraphs. Defendants unjustly retained benefits at

Plaintiff's and millions of creators' expense through conduct that equity and good conscience

cannot tolerate. Defendants enriched themselves through: (a) systematic "forfeiture" of

creator earnings potentially running into billions; (b) perpetual royalty-free licenses to

billions of videos worth untold billions in AI training data; (c) prevention of content

migration maintaining monopoly value; (d) exploitation of creators through fraudulent

partnership representations.

## COUNT 8: Breach of Implied Covenant of Good Faith and Fair Dealing

79.    Plaintiff incorporates all preceding paragraphs. Under Virginia law, every contract contains

an implied covenant of good faith and fair dealing that prevents a party from exercising

contractual discretion in bad faith to deprive the other party of the contract's benefits. This

covenant cannot be waived or disclaimed. See Stoney Glen, LLC v. S. Bank & Trust Co., 944

F. Supp. 2d 460 (E.D. Va. 2013); Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d

535 (4th Cir. 1998).

80.    Google exercised its discretionary powers under the YouTube Partner Program and

AdSense Terms in bad faith to systematically deprive creators of contractual benefits

through: (a) Promising revenue calculations based on "generally accepted accounting

principles" (GAAP) in YPP terms, then declaring payments would be "calculated solely

based on Google's accounting" with no transparency, standards, or recourse; (b) Representing
a "partnership" with "mutual commitment" to induce creator investment, while
simultaneously voiding partnership through contradictory mandatory terms; (c) Exercising
termination discretion through automated systems that Google's own managers "cannot
override," eliminating human judgment and good faith evaluation required when exercising
such consequential discretionary powers; (d) Discriminating between US and European
creators in contract access, providing transparency to foreign creators due to regulatory
pressure while denying it to Americans, using discretion to shield its conduct from scrutiny;
(e) Withholding earned revenue shares under the pretense of "forfeiture"—a governmental
power Google knows it doesn't possess—rather than exercising contractual rights in good
faith; (f) Preventing migration of non-violating content to competitors, serving no legitimate
business purpose except foreclosing competition.

81.    The implied covenant requires that where one party has discretionary power affecting the
other's rights, that discretion must be exercised reasonably and in good faith. See *Va.
Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 156 F.3d 535, 542 (4th Cir. 1998) (party cannot
exercise discretion "in such a way as to deprive the other party of the fruits of the
agreement"). Google's pattern of conduct shows systematic bad faith: promising partnership
while denying it, promising GAAP accounting while providing none, and seizing earned
revenues while blocking access to contracts and data needed to contest these actions.

82.    The breach is particularly egregious given the information asymmetry. Google controls all
analytics, revenue data, and advertiser payments. Creators must trust Google's accounting
without ability to audit. When Google promised GAAP standards—the gold standard of

31

financial transparency—then substituted its own opaque "Google accounting," it breached the heightened good faith obligations that arise when one party controls all information.

## DAMAGES

83.    Plaintiff suffered concrete, measurable injuries directly caused by Defendants' unlawful conduct from EVN Media channel alone: (a) over $1,000 in seized earned revenue; (b) 320 destroyed videos each valued on average conservatively at $4000 in production costs of irreplaceable and the value of sensitive content about war crimes, ethnic cleansing, extrajudicial killings (including first cousin's execution in broad daylight for apparent suspicion of giving information to EVN Media); (c) lost business and global network value from established 65,000 subscribers generating consistent revenue [even this invaluable evidence is erased]; (d) inability to migrate to competing platforms preventing business reconstruction; (e) denial of contractual transparency available to foreign creators by denying access to the YPP contract; (f) destruction of two years' investment building media platform; (g) severe emotional distress from destruction of human rights advocacy work documenting war crimes and testimonies now permanently lost.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendants as follows:

### A. Monetary Relief:

1.    Compensatory damages exceeding $75,000 for destroyed content, seized revenues, lost business value, data, and disrupted human rights advocacy work

2. Treble damages under 15 U.S.C. § 15 for antitrust violations

3. Punitive damages for fraudulent conduct, willful monopolistic abuse, systematic discrimination, and pattern of evidence destruction

4. Damages for intentional spoliation of evidence, financial records, and private date

5. Damages for the intentional infliction of emotional distress

6. **B. Injunctive Relief:**

1. Immediate cessation of discriminatory treatment between US and foreign creators

2. Implementation of sufficient human oversight capability for all automated termination decisions

3. Prohibition on preventing non-violative content migration to competing platforms

4. Accounting of all seized creator funds and establishment of restitution process

5. Access right to creator data, business contacts, contracts, and financial records upon request

**C. Declaratory Relief:**

1. Declaration that forced acceptance of Google AdSense Terms as a bait-and-switch contract of adhesion voiding YPP terms as the superseding agreement with bad faith terms is unconscionable and unenforceable

2. Declaration that discrimination in contract access between US and foreign creators violates public policy

33

3. Declaration that automated irreversible termination without sufficient human review capability violates good faith and fair dealing

4. Declaration that private "forfeiture" of vested earned funds constitutes unlawful conversion

**D. Additional Relief:**

1. Attorneys' fees and costs under 15 U.S.C. § 15 and applicable state laws

2. Pre- and post-judgment interest

3. Such other and further relief as Court deems just, proper, and equitable.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable, as guaranteed by the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

Respectfully submitted,

**Abebe Gellaw**
10004 Chesney Dr.
Spotsylvania, VA 22553
Email: abe.gelaw@gmail.com
Dated: September 24, 2025

**EXHIBIT LIST**

The following exhibits are attached hereto and incorporated by reference:

**Exhibit 1** – Google Manager Jon's August 28, 2025, Email and Plaintiff Reply (Forfeiture Declaration and Migration Denial)

**Exhibit 2** - Google Transparency Report 2024 (28.8 Million Channel Terminations)

**Exhibit 3** - YouTube Partner Program Acceptance Email (September 4, 2023)

**Exhibit 4** - Delaware Corporate Records ( Status of YouTube LLC and Annual Assessment)

**Exhibit 5** - Alphabet Inc. Form 10-K 2024 (YouTube Revenue Disclosure)

**Exhibit 6** - EVN Media Channel "Circumvention" Termination Notice (July 21, 2025)

**Exhibit 7** - Appeal Denial (Automated Response)

**Exhibit 8a** - Manager Aaliyah's August 25, 2025, Email and Reply (Automation Admission)

**Exhibit 8b** - Manager Aaliyah Email Confirmation of August 21, 2025 (Contract Inaccessibility)

**Exhibit 9** - Manager Victoria and ED's Support Transcript (September 20, 2025)

**Exhibit 10** - Representative Shane's Email (Contract Access Discrimination)

**Exhibit 11a** - Manager Sands' August 4, 2025, Email (Case Closure)

**Exhibit 11b** – Manager Sand and Steve "support" Chat, August 18 (Referral to Legal Dept.)

**Exhibit 12** - Support Chat Transcript with Neesa and Jude (August 1, 2025)

**Exhibit 13** - XXVI Holdings Form 1099-MISC (Royalties Classification)

**Exhibit 14** - YouTube Contact Us Page (Google LLC D/B/A YouTube)

35

**Exhibit 15** - XXVI Holdings West Virginia Registration (Google Executive Officers)

**Exhibit 16** - YouTube Partner Program Terms (55% Revenue Share Agreement)

**Exhibit 17** - Google AdSense Terms of Service (No Partnership Disclaimer)

**Exhibit 18** - Thomas Kim Transcript, YouTube Creator Insider (Excerpts, October 10, 2024)

**Exhibit 19** - Neal Mohan Bloomberg Interview Transcript (Excerpts, May 24, 2024)

**Exhibit 20** - YouTube Terms of Service (Royalty-Free License and Royalties Declaration)

**Exhibit 21** – Google's July 10, 2023, YouTube Terms Acceptance Ultimatum (Google.com)

---

## TABLE OF AUTHORITIES

### Federal Cases

*Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902) .......................... ¶ 36

*Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124 (1971) .......................... ¶ 35

*Epic Games v. Google*, No. 3:20-cv-05671-JD (N.D. Cal. Dec. 11, 2023) ........... ¶¶ 16, 75

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .......................... ¶ 7

*Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984) .......................... ¶ 51

*Local 1814 v. Waterfront Commission,* 667 F.2d 267, 271 (2d Cir. 1981)…….. ¶ 50

*Northern Pacific Railway v. United States*, 356 U.S. 1 (1958) .......................... ¶ 51

*Sniadach v. Family Finance Corp.*, 395 U.S. 337, 342 (1969)………………… ¶ 45

*United States v. Bajakajian*, 524 U.S. 321, 331 (1998)………………….. ¶ 50

*United States v. Google, LLC*, WL 3647498 (D.D.C. Aug. 5, 2024) ……………………. ¶¶ 5, 15

*United States v. Google LLC* (E.D. Va. Apr. 17, 2025) ……………………. ¶¶ 5, 14

*United States v. Pomponio*, 429 U.S. 10 (1976)………………………… ¶ 30

*United States v. Scophony Corp.*, 333 U.S. 795 (1948) ……………………. ¶ 8

*Williams v. Walker-Thomas Furniture*, 350 F.2d 445 (D.C. Cir. 1965)……… ¶ 64

**State Cases**

*Economopoulos v. Kolaitis,* 259 Va. 806, 814 (2000)……………..¶ 49

*Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928)………………………………….. ¶ 45

*Stoney Glen, LLC v. S. Bank & Trust Co*., 944 F. Supp. 2d 460 (E.D. Va. 2013)……………….. ¶ 66

**STATUTES**

**Federal Statutes**

15 U.S.C. § 1 (Sherman Act § 1) ……………………. ¶¶ 6, 14, 55-58

15 U.S.C. § 2 (Sherman Act § 2) ……………………. ¶¶ 6, 14, 50-54

15 U.S.C. § 15 (Clayton Act § 4) ……………………. ¶¶ 6, Prayer A.2, Prayer D.1

15 U.S.C. § 16(a) (Clayton Act) ……………………. ¶ 14

15 U.S.C. § 22 (Clayton Act § 12) ……………………. ¶ 7

15 U.S.C. § 26 (Clayton Act § 16) ……………………. ¶ 6

18 U.S.C. § 983 (Civil Asset Forfeiture Reform Act) .......................... ¶ 49

26 U.S.C. § 7201 (Tax Evasion) .......................... ¶ 62

28 U.S.C. § 1331 (Federal Question Jurisdiction) .......................... ¶ 6

28 U.S.C. § 1332 (Diversity Jurisdiction) .......................... ¶ 7

28 U.S.C. § 1337(a) (Commerce and Antitrust Jurisdiction) .......................... ¶ 6

28 U.S.C. § 1367 (Supplemental Jurisdiction) .......................... ¶ 6

**RULES AND REGULATIONS**

Federal Rule of Evidence 801(d)(2)(B) (Adoptive Admissions) .......................... ¶ 47

**Treasury Regulations**

Treasury Regulation § 1.6041-1 .......................... ¶ 62

**Internal Revenue Code**

IRC § 368(a) (Tax-Free Reorganizations) .......................... ¶ 29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
_____Alexandria_____DIVISION

_____Abebe Gellaw_____
Plaintiff(s),

v.

Google LLC, XXVI Holdings Inc.    Civil Action Number: _1:25cv1602-RDA-LRV_
YouTube LLC, Alphabet Inc.
Defendant(s),

## LOCAL RULE 83.1 (N) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared or assisted in the preparation of _____Complaint_____.
(Title of Document)

_____Abebe Gellaw_____
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _09/24/25_ (Date)

OR

The following attorney(s) prepared or assisted me in preparation of _____.
(Title of Document)

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____(Date)